1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      ----------------------------------------X
       EDWINA RANCE, ET AL,
4
                                    PLAINTIFFS,
5
              -against-              Index No.:
6                                   18cv6923(NSR)(JCM)

7      JEFFERSON VILLAGE CONDOMINIUM NO. 5 AND
       MCGRATH MANAGEMENT SERVICES, INC.,
8
                                    DEFENDANTS.
9      ----------------------------------------X

10                    DATE:  August 7, 2019

11                    TIME:  9:48 A.M.

12

13

14           DEPOSITION the Defendant, JEFFERSON

15     VILLAGE CONDOMINIUM NO. 5, by a witness,

16     RICHARD FALCONE, taken by the Plaintiff,

17     pursuant to a Notice and to the Federal

18     Rules of Civil Procedure, held at the

19     offices of Diamond Reporting & Legal Video,

20     50 Main Street, White Plains, New York

21     10601, before Sandra Troiani, a Notary

22     Public of the State of New York.

23

24

25

```
 1                    R.  FALCONE
 2    the circumstances.
 3         Q.    Okay.  Now, if a person wanted
 4    the exception to the bylaws regarding the
 5    age requirement of 55 years and older, do
 6    they have to fill out a form or a document?
 7         A.    No specific form, no.
 8         Q.    Okay.  Are aware of Ms. Rance's
 9    medical limitations?
10              MS. THOMAS:  Objection to the
11         form.
12         A.    Excuse me?
13         Q.    Are you aware of Ms. Rance's
14    medical limitations?
15              MS. THOMAS:  Objection to the
16         form.  It assumes that there are
17         medical limitations.
18         A.    I'm not a doctor.
19         Q.    Are you aware if Ms. Rance
20    could reside in her condominium unit
21    independently?
22         A.    I can't.  I'm not a doctor.  I
23    have no idea.
24         Q.    Well, have you received any
25    doctors' letters from Ms. Rance stating
```

```
 1                    R.  FALCONE
 2   that she cannot?
 3                MS.  THOMAS:   You personally --
 4        Q.     You,  meaning,  JVC?
 5        A.     There were two letters,  I
 6   believe,  we received allegedly from a
 7   doctor.
 8        Q.     And why do you say,  "allegedly
 9   from a doctor"?
10        A.     Because in our opinion,  there
11   was discrepancies in the two -- the two
12   letters.
13        Q.     And what were the
14   discrepancies?
15        A.     The letterheads were different
16   and the signatures were different.
17        Q.     And how were the letterheads
18   different?
19        A.     Different information.
20        Q.     Such as what?
21        A.     I'd -- I'd have to have it in
22   front of me to tell you exactly what it
23   was.
24        Q.     And you said the signature was
25   different?
```

1                    R.  FALCONE

2         A.     Signatures in our opinion were

3    different.

4         Q.     And who thought that the

5    letterhead were different or that the

6    signatures were different; who thought that

7    at JVC?

8         A.     Who brought it up?

9         Q.     Yes.

10        A.     I don't remember.  It was

11   brought up at a -- at a -- at a meeting

12   when the information was presented to us.

13        Q.     And was it you who brought it

14   up or another board member?

15        A.     It could have been me.  It

16   could have been another board member.  I

17   don't remember.

18        Q.     Are you aware that Ms. Rance

19   was diagnosed with a generalize anxiety

20   order?

21        A.     I don't know what she's been

22   diagnosed with.

23        Q.     Have you read the letters?

24        A.     I have read them, but I -- I

25   questioned -- I questioned them or we

```
 1                    R.  FALCONE
 2    questioned them.
 3          Q.     And you questioned for the
 4    letterhead and because of the signature?
 5          A.     That is correct.
 6          Q.     Are there any other reasons why
 7    you questioned the validity of letters from
 8    Ms. Rance's medical providers?
 9          A.     No.
10          Q.     Okay.  So the board questioned
11    the --
12          A.     No, wait a minute.  The
13    letterheads were different.  The
14    signatures, in our opinion, were different
15    and the coincidental or not, the text in
16    the messages was similar -- were the same
17    as those of Ms. Rance's computer and we
18    just questioned whether or not they were
19    valid.
20          Q.     What do you mean similar to Ms
21    Rance's computer, the text?
22          A.     Well, if you look at the type
23    face here, (indicating), and you look at
24    the type face --
25                 MS. THOMAS:  Referring to
```

```
 1                    R.  FALCONE
 2          Plaintiff's 13.
 3          A.     -- the front --
 4          Q.     Right.   The front on
 5    Plaintiff's 13?
 6          A.     Yes, the font on that -- that
 7    particular letter --
 8          Q.     Right.
 9          A.     -- as in other communications
10    from her is the same as that from her
11    doctor and it just raised a little bit of a
12    flag.
13          Q.     And why does that raise a flag,
14    if the fonts are the same, why is that
15    being suspicious?
16          A.     Somewhat unusual.
17          Q.     Okay.   Doesn't everyone have
18    access to the same fonts who has a word
19    processor?
20          A.     Sure, they do.   Yes.
21          Q.     So why is that suspicious if
22    it's the same font she shares with her
23    doctor or physician?
24          A.     Coincidental.   I -- it was just
25    something -- it was -- a question was
```

```
 1                    R.  FALCONE
 2   raised.
 3        Q.     Who raised that question about
 4   the font?
 5        A.     Probably me.
 6               MS. THOMAS:  Off the record.
 7               (Whereupon, an off-the-record
 8            discussion was held.)
 9        Q.     Were there any board members
10   that said that JVC should not be
11   questioning the validity of the physician's
12   letters?
13               MS. THOMAS:  Objection to the
14            form.  You can answer if you
15            understand.
16        A.     Repeat that please.
17        Q.     Withdrawn.  Let me go back to
18   what you said.
19               You said that JVC had questions
20   regarding the difference in letterheads,
21   there's a difference in signature and the
22   similarity in the font in the --
23        A.     Yes.
24        Q.     -- in the letters that Ms.
25   Rance provided from her medical provider?
```

1                       R. FALCONE

2        A.      Yes.

3        Q.      Now, did any member of the

4   board say, well, we shouldn't be

5   questioning the letters.   That's not a

6   reasonable concern?

7                MS. THOMAS:   Objection to the

8            form.   You can answer if you

9            understand.

10       A.      I -- I don't know where you're

11  going, but there was unanimous agreement

12  that there was something wrong.

13       Q.      Did anyone disagree?

14       A.      No, that's what unanimous

15  means.

16       Q.      Okay.

17               MR. BAHAMONDE:   Would you mark

18           this as Exhibit 14.

19               (Whereupon, COVER DATED 11/8/16

20           was marked as Plaintiff's Exhibit 14

21           for identification as of this date by

22           the Reporter.)

23       Q.      Now, I want to show you what's

24  been marked as Plaintiff's 14 for

25  identification.   These are documents

1                    R.  FALCONE

2      provided by the attorney in disclosure --

3      in discovery of this case.   They're Bates

4      stamped documents JVC-015 through 017.

5      Now, please take a look at that.   Let me

6      know when you're finished.

7           A.     (Witness complies.)   Okay.

8           Q.     Now, have you seen this

9      document before?

10          A.     Yes.

11          Q.     And what is it?

12          A.     It's a cover letter from Ms.

13     Rance saying there were two documents

14     enclosed and there are two letters

15     allegedly from her psychologist.

16          Q.     And the date of this letter is

17     November 8, 2016, correct?

18          A.     That's the date of her letter,

19     yes.

20          Q.     All right.   And why did she

21     provide this confidential document for; are

22     you aware?

23          A.     We -- we asked for

24     documentation on her -- she had claimed

25     health problems.   We asked for

```
1                        R.  FALCONE
2     documentation.   This is what she sent us.
3              Q.      Why did Edwina Rance state to
4     the board that she had health problems, in
5     support of what?
6              A.      In support of having her son
7     stay there.
8              Q.      Okay.   The next -- on JVC 16,
9     you see the letter from Dr. Eustace?
10             A.      Yes.
11             Q.      Okay.   Now, compare 16 to 17,
12    JVC 16, JVC 17.
13             A.      Yes.
14             Q.      Were these two documents the
15    ones that are questionable to you, the
16    letterhead and the signature?
17             A.      Yes.
18             Q.      Well, show me the reasons why
19    you questioned these letters?
20                     MS. THOMAS:   Objection to the
21            form.   Can you state the reasons?
22             A.      A standard letterhead -- the
23    letterheads are different for starters.
24    One has different numbers, one has a
25    telephone number.   The signatures are
```

```
 1                    R. FALCONE
 2   different.  One is signed Thomas, one is
 3   signed Thomas D and as far as I know,
 4   doctors always, always sign documents the
 5   same way and this looked -- the signatures
 6   looked different.  They look like they were
 7   written by two different people, let me put
 8   it that way.
 9          Q.    Now, you said as far as you
10   know, doctors sign their signature the same
11   way and what is that based on?
12          A.    Prior -- if I -- I've always
13   recognized my -- my doctor's signature.
14          Q.    And your doctor doesn't sign
15   differently?
16          A.    Never signed it differently
17   that I know.
18          Q.    And if the doctor signs
19   differently, does that make something
20   invalid, in your opinion?
21          A.    If he signs it, it doesn't make
22   it invalid.  Again, we found them
23   questionable.  We questioned her and she
24   did not follow up.
25          Q.    Now, on -- you see on 16 -- JVC
```

```
 1                    R.  FALCONE
 2   16,  the  signature,  Thomas,  do  you  see  that
 3   on  JVC  --
 4        A.    Yes.
 5        Q.    And  now  look  at  JVC  17,  top,
 6   the  signature  --  the  first  --  the  word,
 7   Thomas,  do  they  look  different  to  you?
 8        A.    The  word  Thomas  in  the  two
 9   signatures?
10        Q.    Yes.
11        A.    Somewhat,  yes.
12        Q.    And  what's  different  about
13   them?
14        A.    The  loop  on  the  letter  T.   I'm
15   not  an  expert  in  handwriting  and  on  the  --
16   the  end  of  it,  there's  an  A  on  one  and  a
17   blurb  and  this  one  it's  an  A  and  what  looks
18   to  be  an  S.
19        Q.    All  right.   And  you  also
20   testified  that  the  letterhead  is  different
21   --
22        A.    Yes.
23        Q.    --  and  that  raised  --  raised
24   the  board's  suspicion;  is  that  accurate?
25        A.    Yes.
```

```
 1                    R. FALCONE
 2         Q.     Now, why did that raise
 3    suspicion; having two different letterhead,
 4    why would that raise the suspicion of the
 5    contents of that letter being -- may be
 6    questionable?
 7         A.     Because it's -- it's different
 8    information on the two of them and I would
 9    think that any doctor would have -- and I
10    don't know what it's supposed to be, but
11    they would have identical information on
12    both.  You don't change letterheads and
13    then change information also.
14         Q.     Why not?
15         A.     Just an opinion.
16         Q.     And you said that was a
17    unanimous opinion from the other board
18    members also?
19         A.     Yes, it was.
20         Q.     Now, did anyone at the board
21    contact Dr. Eustace and ask him about his
22    signature or the letterhead, the questions
23    of that?
24         A.     No.
25         Q.     Why not?
```

```
1                      R. FALCONE
2          A.     It wasn't our job to call --
3     call a doctor.
4          Q.     But wasn't Ms. Rance's request
5     for an accommodation to the board?
6                 MS. THOMAS:  I'm sorry?
7          Q.     Wasn't Ms. Rance reporting her
8     request for an accommodation to the board
9     with these letters?
10         A.     Yes.
11         Q.     And you said you were --
12         A.     If -- if we were to do this it
13    would be through our attorney, not -- not
14    -- not personally.
15         Q.     You said, "if we," if JVC would
16    have done what?
17         A.     Contact the doctor; we would
18    not personally contact the doctor.
19         Q.     Why not?
20         A.     Why?
21                MS. THOMAS:  He just answered
22          your question.
23         A.     I just answered your question.
24    We would pass that to our attorney.
25         Q.     But why would you pass it to an
```

```
 1                    R.  FALCONE
 2    attorney; why would JVC decide not to make
 3    the call themselves?
 4          A.     Because I don't think it's our
 5    -- we're in a position to question
 6    somebody's doctor.  A doctor is going to
 7    claim privilege.  Why should I -- there's
 8    no reason for me to call the doctor.
 9          Q.     And what does that mean to you,
10    claim privilege; what does that mean?  The
11    confidential --
12          A.     Doctor confidentiality.  I'm
13    gonna -- yo, doc.
14          Q.     So the contents of the letter
15    regarding Ms. Rance's medical condition,
16    that's confidential, correct?
17          A.     Between her and her doctor, I
18    would assume, yes.
19          Q.     Right.  How about the letter,
20    is that confidential, the doctor's letter?
21          A.     No --
22          Q.     How about --
23          A.     -- that letter is a standard
24    piece of paper.
25          Q.     How about a signature on -- a
```

```
 1                    R.  FALCONE
 2      doctor's signature, is that confidential
 3      information, a signature?
 4           A.    No, not to me.
 5           Q.    So then --
 6           A.    It's the content that counts.
 7           Q.    Right.  So --
 8           A.    I would not be privy to the
 9      content of a letter between her doctor and
10      her.
11           Q.    So if you questioned a doctor
12      regarding the heading or the signature, as
13      you said it was not confidential
14      information so what's the problem?  What --
15           A.    No, because it's --
16           MS.  THOMAS:   Note my objection.
17           Counselor, are you saying that you're
18           authorizing JVC 5 to contact Dr.
19           Eustace?
20           MR.  BAHAMONDE:   No, I'm asking
21           him why --
22           MS.  THOMAS:   No, that is the
23           question.  Is that what you're
24           authorizing?
25           MR.  BAHAMONDE:   Right.  I said,
```

```
1                    R.  FALCONE
2        no,  why didn't you contact Dr.
3        Eustace regarding --
4        A.     You're asking me to pick apart
5   a letter and say,  well,  doc,  you can talk
6   to me about this,  you can talk to me about
7   this,  but you can't talk to me about this.
8   I'm not in a position to do that.   Anything
9   that has to do with these situations should
10  be and is handled through our attorney.
11       Q.     Now,  did JVC ask its attorney
12  to contact Dr.  Eustace to question him
13  about the letterhead?
14       A.     We did not ask him to -- ask
15  our attorney to contact Dr.  Eustace
16  directly to my knowledge.
17            MS.  THOMAS:   Note -- objection
18            to any line of question that would
19            call for any privilege communication
20            between JVC 5 and his attorney.
21            MR.  BAHAMONDE:   Right.
22       Q.     Has JVC asked anyone to contact
23  Dr.  Eustace regarding the signature,  to
24  question the doctor whether it is his
25  signature on the letter?
```

```
 1                    R.  FALCONE
 2          A.     We had not personally contacted
 3    Dr. -- Dr.  Eustace.
 4          Q.     Has JVC 5 asked anyone to
 5    contact Dr. Eustace on their behalf
 6    regarding the signature on both of these
 7    letters?
 8          A.     Not directly.
 9          Q.     What do you mean, "not
10    directly"?
11          A.     To contact the doctor.  There
12    was communication between our attorney and
13    her attorney of record regarding this
14    documentation I believe and that's the way
15    it was handled.
16              MS.  THOMAS:   And by counsel, it
17          was requested on the record that Ms.
18          Rance provide an Arons authorization
19          so that contact can be made directly
20          to Dr. Eustace.
21              MR.  BAHAMONDE:   Could you read
22          that back by the attorney.
23              (Whereupon, the referred-to
24          attorney comment was read back by the
25          reporter.)
```

                        R. FALCONE

1   

2          Q.    I want to draw your attention

3   to JVC 16, same page.  It's the letter

4   dated January 21, 2016 from Dr. Eustace.

5   Now, have you read the contents of this

6   letter starting with to whom it may

7   concern, ending with sincerely yours; have

8   you read those words before?

9          A.    Yes.

10         Q.    And have you read them before

11  today?

12         A.    Yes.

13         Q.    Did you read them when Ms.

14  Rance gave them to the board?

15         A.    Yes.

16         Q.    Okay.  Now, did you question

17  any of what is said there?

18         A.    We did not question the

19  content.  We questioned the validity.

20         Q.    What do you mean by that, we

21  questioned the validity?

22         A.    We -- the two documents were

23  presented at the same time.  We looked at

24  the two.  We -- what one said and what the

25  other said was irrelevant as far as we were

1                    R.  FALCONE

2    concerned because we didn't believe that

3    they were both from the same individual

4    which we questioned through our attorney to

5    her attorney.

6            Q.    So what happened after the

7    board received this document from Ms. Rance

8    with the two supporting physicians'

9    letters?

10           A.    As I said before, we questioned

11   whether or not they were written by the

12   same individual.  We passed this on --

13   information onto our attorney who was in

14   contact with her attorney regarding the

15   status of this situation.

16           Q.    And that was in November of

17   2016?

18           A.    I don't remember when it was.

19           MR.  BAHAMONDE:   Mark this

20        please.

21             (Whereupon, LETTER DATED 5/5/17

22        was marked as Plaintiff's Exhibit 15

23        for identification as of this date by

24        the Reporter.)

25           Q.    I want to show you what's been

```
 1                    R.  FALCONE
 2    Edwina Fryer Rance is under my medical
 3    care, I have seen her recently for
 4    increased anxiety and panic attacks.  She
 5    has a history of a generalized anxiety
 6    disorder.  She has increased anxiety in the
 7    evening and at night and her son's presence
 8    at home helps her with this.  It is
 9    necessary for her to have an aid at night
10    to help her -- the above mentioned
11    symptoms.  She does not have the resources
12    to hire an aid, hence, her son's presence
13    in her home is necessary."  Do you see
14    that?
15         A.    Yes.
16         Q.    Do you question the validity of
17    this letter?
18         A.    Nope.
19         Q.    Do you question the medical
20    opinion of the doctor in this letter?
21         A.    I don't know what he is a
22    doctor of.  Is he a --
23         Q.    And why does that matter?
24         A.    Well, because physicians in
25    general treat physical ailments.
```

1                       R.  FALCONE

2       Psychiatrist/psychologist treat mental

3       ailments.   I don't know what this man's or

4       a woman -- I don't know if it's a man or a

5       woman.

6            Q.     So you're unaware of what Dr.

7       Uppal's specialty is?

8            A.      No idea and I don't understand

9       how Dr. Uppal could state emphatically, she

10      does not have the resources.   He's just

11      repeating what she told him.

12           Q.     Did you ask Edwina Rance for

13      her financial records?  By you, I mean --

14           A.      Her attorney was asked -- her

15      attorney was asked for a lot of information

16      and then her attorney dropped off the face

17      of the earth, I guess.

18           Q.     Do you know what happened?

19           A.      I have no clue because we got

20      -- we got no response.   We asked for

21      specific -- through our attorney, asked for

22      specific documentation which was never

23      provided and it was not -- the information

24      was not to be just sent to the board.   It

25      was for the attorney's eyes only.